IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| GRAHAM DEVELOPMENT CORPORATION and MOO MOO MEADOWS, LLC, | § § § § | |
| Plaintiffs, | § § § | |
| v. | § § | 1:25-CV-1196-RP |
| TRAVIS COUNTY, TEXAS, | § § | |
| Defendant. | § § | |

**ORDER**

Before the Court is Defendant Travis County, Texas's ("Travis County" or "the County") Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Mot. to Dismiss, Dkt. 4). Plaintiffs Graham Development Corporation ("Graham Development") and Moo Moo Meadows, LLC ("Meadows") (collectively, "Plaintiffs") filed a Response on September 26, 2025, (Dkt. 7), and the County filed a Reply on October 3, 2025, (Dkt. 8). Subsequently, in light of the development that the County had begun proceedings to possess the property at issue through eminent domain, the Court ordered the parties to file supplemental briefing regarding subject matter jurisdiction and standing. (Order for Supp. Br., Dkt. 15). Plaintiffs filed supplemental briefing, (Dkt. 16), the County responded, (Dkt. 18), and Plaintiffs replied, (Dkt. 19). Having considered the parties' briefs, the evidence, and the relevant law, the Court will grant the motion to dismiss.

**I. BACKGROUND**

Around 1968, Travis County leased property ("the Property") from Joe T. and Joyce Robertson ("the Robertsons") at 9500 E. Highway 290, Austin, Texas to operate a Type 1 landfill ("the Landfill"). (Compl., Dkt. 1, at 5–6). The County soon after began landfill operations on the

Property;[1] since then, the County has allegedly frequently been cited by the Texas Commission on Environmental Quality ("TCEQ") and TCEQ's predecessor agencies for violations related to leachate leakage.[2] (*Id.* at 6). Plaintiffs claim that the County, over "the next half-century," "has repeatedly promised to undertake remediation efforts to prevent leachate leakage" but then "repeatedly refused to do so, despite repeated findings of continuing toxic pollutions." (*Id.* at 7).

In the late 1970s to early 1980s, the County took steps to close the Landfill. Additionally, in 1973, the Robertson family leased Austin Country, LLC a portion of the property to operate a Flea Market. (*Id.* at 11). In 1977, the Texas Department of Health (a predecessor to TCEQ) issued Travis County a permit to continue operating the Landfill for disposal of solid waste and to properly close the Landfill in accordance with applicable regulations. (*Id.* at 7). That same permit, Permit No. 684, also "expressly required measures to be taken to prevent contaminants from entering the tributaries of Walnut Creek, which traverse the site."[3] (*Id.*). In 1980, Travis County entered into a second lease with the Robertsons, which included a provision where the County agreed to "take any corrective actions resulting from County closure operations and found insufficient for final closure approved by the Texas Department of Health." (*Id.* at 8). The Landfill stopped accepting waste in 1982, but Plaintiffs claim that "to this day"—approximately forty-four years later— "Travis County continues to engage in post-closure activities because it is unable or unwilling to stop leachate runoff." (*Id.*).

In the early 1990s, the County prepared two reports regarding remedial measures to address leachate leakage through the soil and into Walnut Creek. (*Id.*). Plaintiffs plead that, though Travis

---

[1] Plaintiffs represent that limited records indicate that operation of the Landfill began in 1968, though no permits have been located from prior to 1973. (Compl., Dkt. 1, at 6).

[2] Leachate is what "form[s] when rainwater filters through wastes placed in a landfill. When this liquid comes in contact with buried wastes, it leaches, or draws out, chemicals or constituents from those wastes." Municipal Solid Waste Landfills, U.S. Env't Prot. Agency, https://www.epa.gov/landfills/municipal-solid-waste-landfills (last visited Jan. 26, 2026).

[3] Permit No. 684 also required the County to take steps to "prevent erosion and improve the general appearance of the site." (*Id.* at 7).

County itself authored the report, it "did nothing of substance that was recommended." (*Id.*). The County allegedly submitted leachate reports to TCEQ in 1999 and 2001, but Plaintiffs claim that no more recent reports are readily available from TCEQ, which they argue "is disturbing considering leachate continues to leak into the Walnut Creek tributaries on the property . . . to this day." (*Id.* at 9).

In 2005, TCEQ issued an order[4] directing Travis County to "complete corrective actions necessary to prevent leachate migration from the [L]andfill." (*Id.* at 10). Plaintiffs plead that "[a]gain, the County did nothing of substance and leachate leakage continued." (*Id.*). In 2009, TCEQ issued Travis County a Notice of Violation ("NOV") after a site investigation "found evidence of subsidence and the ponding of water in depressions in a parking lot on the site, in addition to Travis County's failure to investigate a release to groundwater after Travis County claimed a seep (leachate emanating from surface soils) on the site." (*Id.*). The NOV required a compliance plan, which the County allegedly submitted with a promised schedule to fix the outstanding violations. (*Id.*). Despite the compliance plan submitted to TCEQ, Plaintiffs allege that Travis County still took no substantive actions to prevent leachate leakage into Walnut Creek. (*Id.* at 10). Approximately two years later, Travis County "admitted that [its] . . . 2009 compliance plan had not been fully completed" and revised its compliance plan. (*Id.* at 10–11).

In 2012, Travis County, the Robertson Family (doing business as Robertson Family 290 Property, LLC), and the Austin Country Flea Market (doing business as Austin Country, Inc.) entered into a contract entitled "Cooperation Agreement for Remediation of the U.S. 290 Municipal Solid Waste Landfill by Travis County, Austin Country, Inc., and Robertson Family 290 Property, LLC" (the "Cooperation Agreement"). (*Id.* at 11). The Cooperation Agreement required, *inter alia*, for the County to "remediate post-closure failures on its part that resulted in the 2009 NOVs issued

---

[4] Agreed Order No. 2003-1501-MSW-E.

to the County by TCEQ related to leachate leakage." (*Id.*). Relatedly, the Cooperation Agreement

provided:

> 14. All Parties agree that *TCEQ determines* whether use of the Property, including current use of the Property, is or is not materially detrimental to the TCEQ's landfill closure and post-closure care requirements and agree not to use the Property for any purpose that would be materially detrimental to *TCEQ's landfill closure and post-closure care requirements.*

(*Id.* at 12) (emphasis added by Plaintiffs). Notably, the Cooperation Agreement also required certain

actions to "allow for the continued operation of the flea market." (*Id.* at 11).

> The Cooperation Agreement also provides:

> 15. The Owner shall provide the County with written notice and the opportunity to review all future lease agreements, licenses, sales, or similar arrangements that allow for a continued use by Austin Country for the 21-acre flea market or any new use of the Property that affects the area above the closed Landfill that become effective subsequent to the Effective Date of this Agreement. Upon review, if the proposed use of the Property is incompatible or will compromise the maintenance of the Landfill's closure care, the County may deny the proposed lease, license or other arrangement for use of the Property.

(*Id.* at 12; Cooperation Agreement, Dkt. 1-3, at 6–7). Plaintiffs plead that this provision is "wholly

incompatible and irreconcilably conflicts with the prior recognition that TCEQ determines what

land uses might be materially detrimental to TCEQ's landfill closure and post-closure care

requirements based on state law." (*Id.* at 13). They also argue that the provision "purports to divest

the TCEQ of its exclusive regulatory authority over the closure and post-closure care of the landfill

that is vested in it under" the Solid Waste Disposal Act ("SWDA").[5] (*Id.*). And, Plaintiffs contend,

by both (1) "refusing to competently complete its post-closure care" of the Landfill and (2) taking

advantage of the above-quoted provision purporting to give the County the power to review

---

[5] Plaintiffs allege that the County knew it lacked this authority, as "[t]ranscripts from the Commssioners Court meeting where the Cooperation Agreement was signed" include the statement that "Neither we, the flea market, nor the landowners determine if something impacts the landfill's integrity. That determination is made solely by TCEQ." (*Id.* at 16).

proposed uses of the property, the County has "used [the provision] as a bludgeon to stifle lawful development and exercise land use regulatory control in an arbitrary and capricious fashion." (*Id.*).

Subsequent to the creation of the Cooperation Agreement, in 2013, TCEQ "approved the registration that allowed the Flea Market to operate on an approximately 21-acre site situated on top of the landfill that was to include an office, restrooms, onsite trailers used by vendors, an onsite security trailer, concession stands, a barbershop, storage building and associated asphalt covered parking lots." (*Id.* at 14). In 2016, in response to a complaint about conditions at the Landfill, TCEQ investigated and issued additional NOVs for "failure to prevent the unauthorized discharge of sewage, municipal waste, recreational waste, agricultural waste or industrial waste into or adjacent to any water in the state and for failure to prevent the ponding of water over waste on the landfill cover." (*Id.*).

In April 2023, Plaintiff Graham Development, on behalf of Plaintiff Meadows, filed an application with Travis County for permission to construct a recycling use atop" the Landfill. (*Id.* at 3, 15). More specifically, Graham Development planned to "lease, license or enter into an arrangement to relocate LKQ Auto Salvage Yard" to the Property. (*Id.* at 15). In May 2025, Graham Development "provided additional information as requested by Travis County." (*Id.*). Subsequently, on August 1, 2023, "citing authority exclusively reserved to [] TCEQ under [the] SWDA," Travis County's Commissioners "voted to deny Plaintiffs' proposed new use of the [L]andfill." (*Id.*). The County purportedly wrote in a letter to Plaintiff Graham Development's counsel that "the County's 'staff' had reviewed the proposed used and determined that Plaintiffs' proposed use is 'fundamentally incompatible with the County's ongoing responsibility for effectively managing the Landfill and protecting human health, safety, and the environment, as required by 30 Tex. Admin.

Code § 330.463 (TCEQ, Post-Closure Care Requirements, Mar. 27, 2006)."[6] The County also purportedly "asserted rights under Section 15 of the Cooperation Agreement, which conveys [to the County] certain rights to written notice and the opportunity to 'review' . . . any new use that affects the area above the Landfill." (Compl., Dkt. 1, at 22). Plaintiffs assert that, separate from whether the County had the authority to make such a determination, the Commissioners' denial was arbitrary and capricious. (*Id.* at 16–17). In support of their argument, Plaintiffs point out that the existing use of the property as a flea market includes the sale of manufactured and used auto parts—"which is the same use to which Plaintiffs would put the property, just on a larger scale." (*Id.* at 17).

In February 2024, approximately six months after the County's August 2023 denial of the new usage, Plaintiff Meadows purchased the Property.[7] Plaintiffs allege that they continued to try to "amicably resolve this impasse" with the County. (*Id.* at 18). After meeting with County employees, Commissioners, and the County Judge, Plaintiffs informed the County that they "intended to hold the County to its legal obligations to remediate the property," but were amendable to "assist[ing] the County with significant capital and expertise in remediating the Property if the County" would approve Plaintiffs' plans to relocate LKQ Auto Salvage. (*Id.* at 19). Plaintiffs purportedly "advised the County that the proposed LKQ lease would be the least intrusive to the land, most tolerant of subsidence (which means less remediation), and LKQ could provide substantial monitoring of the site." (*Id.*). These negotiations ultimately failed. (*Id.*).

Based on the above allegations, Plaintiffs claim that the County has purposefully refused to perform necessary remediation measures to allow "final closure" of the Landfill "for over 30 years and counting" because it desires to continue its "unlawful, arbitrary and irrational control over the

---

[6] Plaintiffs note that this regulation was adopted pursuant to the SWDA, "which vests sole authority for regulation of landfills in the TCEQ." (*Id.* at 16).

[7] The Court finds that it may take judicial notice of the Special Warranty Deed that passed ownership of the Property to Meadows, as it is referenced in Plaintiffs' Complaint and is central to their claim. *See Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

Property." (*Id.* at 20–21). They plead that the County's actions amount to an unlawful taking without just compensation in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and to violations of their procedural and substantive due process rights under the Fourteenth Amendment. (*Id.* at 27–31). In the alternative, Plaintiffs plead that the County materially breached the terms of the Cooperation Agreement. (*Id.* at 32). Plaintiffs seek just compensation, damages, a declaratory judgment relating to the authority of TCEQ to exclusively determine land use compatibility of the proposed LKQ Auto Salvage lease, and a writ of mandamus ordering the County to take certain actions. (*Id.* at 32). In response, the County filed a motion to dismiss each of the claims against it under Federal Rules of Civil Procedure 12(b)(1) and (b)(6). (Mot. Dismiss, Dkt. 4).

## II. LEGAL STANDARDS

### A. Rule 12(b)(1)

Rule 12(b)(1) allows a party to assert lack of subject-matter jurisdiction as a defense to suit. Fed. R. Civ. P. 12(b)(1). Federal district courts are courts of limited jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). A motion to

dismiss under Rule 12(b)(1) must be considered before addressing any attack on the merits.[8]

*Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted).

### B. Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and

---

[8] Where a defendant's immunity is based on the existence of a valid claim, however, the Court will analyze those claims under the Rule 12(b)(6) standard. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012) ("In the absence of a properly pled takings claim, the state retains immunity."); *Chavarin v. City of El Paso*, No. EP-10-CV-0339-KC, 2011 WL 13234975, at *6–8 (W.D. Tex. Apr. 25, 2011) (holding that sovereign immunity did not deprive the Court of jurisdiction over a takings claim because the plaintiffs had sufficiently pleaded a takings claim).

matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant,* 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.,* 563 F.3d 141, 147 (5th Cir. 2009)).

## III. DISCUSSION

### A. Threshold Issues of Standing and Redressability

First, the County argues that Graham Development does not have standing to bring this action, as it is not an owner of the Property and was not a party to the Cooperation Agreement. (Mot. to Dismiss, Dkt. 4, at 2, 17–18). It also argues that Meadows does not have standing to assert a regulatory takings claim, as Meadows purchased the Property after the alleged taking on August 8, 2023. (*Id.*). The Court will quickly dispose of these arguments. Meadows, as the owner of the Property at issue in this case, has standing. The Supreme Court has explicitly stated that a "valid takings claim will not evaporate just because a purchase took title after the law was enacted." *Murr v. Wisconsin,* 582 U.S. 383, 398 (2017). *See also Palazzolo v. Rhode Island,* 533 U.S. 606, 627–28 (2001) ("Future generations, too, have a right to challenge unreasonable limitations on the use and value of land."). And, because Meadows has standing to bring the claims asserted in this lawsuit, the Court need not reach whether Graham Development has standing. *See Jackson v. Tarrant County,* 158 F.4th 571, 584 (5th Cir. 2025) (citation omitted) ("[I]t is well settled that once we determine that at least

one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit.").

Second, the Court addresses a significant development that has occurred in this case since the live pleading was filed. Plaintiffs' Response includes documentation that—on the same day Travis County filed its Motion to Dismiss—Travis County sent Meadows a letter stating:

> . . . Travis County is acquiring property that is necessary or convenient for the purposes of solid waste management of the Highway 290 East Landfill. Travis County is also acquiring parkland for community use. The Travis County Transportation and Natural Resources Department is initiating the process of acquiring property for these purposes and it is necessary or convenient for Travis County to acquire your property for solid waste management and for parkland.

(Travis County Offer Letter, Dkt. 7-1, at 1). Because neither Travis County's Motion to Dismiss nor Plaintiffs' Response discussed how the eminent domain proceeding affects this action, the Court ordered the parties to file supplemental briefing on whether Plaintiffs continue to have standing and on whether Plaintiffs' alleged injuries remain redressable by the Court. (Order, Dkt. 15). Plaintiffs filed supplemental briefing, (Dkt. 16), the County responded, (Dkt. 18), and Plaintiffs filed a reply, (Dkt. 19).

Based on the briefing, the Court agrees with Plaintiffs that they continue to have standing and that, should their claims have merit, the Court could redress their injuries—at least in part. If the County indeed does take the Property through its eminent domain powers, but had previously effected an unconstitutional taking without just compensation, that "subsequent action" cannot "relieve it of the duty to provide compensation for the period during which the taking was effective." *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 321 (1987). Plaintiffs' breach-of-contract claim would also not be extinguished by a subsequent condemnation of the Property. Thus, even if the County succeeds in condemning the Property, the

10

Court could nonetheless redress Plaintiffs' earlier injuries through an award of damages, even if injunctive relief is no longer available.[9]

The Court will therefore reach the merits of Plaintiffs' causes of action. And, because the Court ultimately finds that the County's motion to dismiss Plaintiffs' Complaint should be granted, the Court will not yet address the County's argument in its Brief of Mootness and/or Standing that the Court should abstain from considering Plaintiffs' claims in this suit until the condemnation suit proceeding in state court has concluded. (County's Supp. Br., Dkt. 18, at 5–8).

### B. Breach of Contract

Because Plaintiffs have pleaded a breach-of-contract claim and a takings claim in the alternative, the Court will follow the Fifth Circuit's instruction to "assess the breach-of-contract claim in the first instance, and then examine the takings claim if the breach claim falters." *See Mesquite Asset Recovery Grp., L.L.C. v. City of Mesquite*, 154 F.4th 313, 317 (5th Cir. 2025) (explaining that plaintiffs "may plead both a breach-of-contract claim and a takings claim as alternative theories of recovery when challenging the same government action" and that, in such a scenario, a court should first address the contract claim). "[This] practice smartly ensures that such cases can be decided 'on non-constitutional grounds when that is available,' and further promotes judicial efficiency, since a party 'can obtain only one recovery for a single harm.'" *Id.* (quoting *Century Expl. New Orleans, Inc. v. United States*, 103 Fed. Cl. 70, 82–83 (2012)).

Plaintiffs allege that Travis County has breached Section 17(o) of the Cooperation Agreement, which provides:

> Nothing in this Agreement will be construed to hinder or prevent Owner from making lawful use of part or all of the Property in a manner that does not (i) have a material adverse impact on the maintenance or care of the Landfill and/or (ii) violate the terms of this Agreement, the License, the County Lease (to the extent still applicable), or the Austin Country Lease.

---

[9] For instance, should the County succeed in condemning the Property prior to the conclusion of this lawsuit, the Court could no longer award injunctive relief regarding the use of the property.

(Compl., Dkt. 1, at 32–33; Cooperation Agreement, Dkt. 4-2, at 11). The County argues that its sovereign immunity bars this claim and moves to dismiss the claim under Rule 12(b)(1). (Mot. to Dismiss, Dkt. 4, at 18). It cites to case law supporting that entering into a contract with a private party does not waive a governmental entity's immunity from suit. (*Id.*). *See Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704, 705 (Tex. 2003) ("When the governmental unit contracts with a private party it waives immunity from liability, but not immunity from suit. The governmental unit waives immunity from suit only through its express consent"). Plaintiff responds that, to the contrary, the state legislature has chosen to waive a local governmental entity's immunity from suit when the entity "enters into a contract" "for providing goods or services to the local governmental entity." (Resp., Dkt. 7, at 11–12) (citing Tex. Loc. Gov't Code §§ 271.151–160).[10]

Even assuming the Cooperation Agreement qualifies under § 271.151(2) as a contract "for providing goods or services to the local governmental entity," the Court finds that Chapter 271 does not apply in this case. In defining a "[l]ocal governmental entity" for the purposes of Chapter 271, the statute reads: "a political subdivision of this state, *other than a county*." *Id.* § 271.151(3) (emphasis added). *See also Potter County v. Tuckness*, 308 S.W.3d 425, 431 (Tex. App.—Amarillo 2010, no pet.) ("But a county is excluded from the coverage of Chapter 271 because its definition of local governmental entity expressly excludes a county. Accordingly, Chapter 271 has no application here."). The Texas Legislature therefore has not chosen to waive the County's sovereign immunity from suit in this context, and the Court must dismiss this claim against the County without prejudice

---

[10] The provision to which Plaintiffs refer reads: "A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter." Tex. Loc. Gov't Code § 271.152. A contract "subject to this subchapter" is defined as, *inter alia*, "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *Id.* § 271.151.

for lack of jurisdiction.[11] *See Warnock v. Pecos County*, 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice.").

The Court also notes that, to the extent Plaintiffs wish to amend their pleading to add claims against County officials for *ultra vires* actions, such a claim would also be futile. (*See* Resp., Dkt. 7, at 11) (discussing the possibility of pursuing an *ultra vires* claim against County officials to the extent the Cooperation Agreement falls within the County's governmental immunity). "[I]mmunity for an ultra vires act is only a waiver with regard to bringing future acts into compliance with the law." *City of Galveston v. CDM Smith, Inc.*, 470 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citing *City of El Paso v. Heinreich*, 284 S.W.3d 366, 376 (Tex. 2009)). "A suit brought under the ultra vires acts waiver of governmental immunity thus cannot be used to obtain monetary relief for past damages from such acts," and parties cannot "circumvent governmental immunity by characterizing a contract dispute seeking monetary damages as a declaratory-judgment claim." *Id.* at 569–570 (first citing *Heinrich*, 284 S.W.3d at 374–76; and then citing *Tex. Nat. Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 856 (Tex. 2002)). Because Plaintiffs' breach-of-contract claim seeks monetary damages for a past action (the August 2023 denial of the application for a new use), they could not plausibly plead a claim for contract-related *ultra vires* relief against County officials.

Because Plaintiffs' "breach claim falters," the Court will now reach Plaintiffs' takings claim. *See Mesquite Asset Recovery Grp.*, 154 F.4th at 317.

---

[11] Though Plaintiffs are barred from seeking damages due to the County's sovereign immunity, the Court notes that the Cooperation Agreement itself provides a remedy. "Upon review, if the proposed use of the Property is incompatible or will compromise the maintenance of the Landfill's closure care, the County may deny the proposed lease, license, or other arrangement for use of the Property. **Any dispute will be resolved by declaratory judgment action in a Travis County District Court**." (Cooperation Agreement, Dkt. 4-2, at 8) (emphasis added). Plaintiffs do not address this provided-for remedy in their Complaint or their Response in opposition to the motion to dismiss.

**C. Regulatory Takings Claim Under 42 U.S.C. § 1983 and Texas Constitution**

The Court first addresses Plaintiffs' claim that Travis County's denial of a permit on August 1, 2023, for Meadows to construct a "recycling use atop the closed Travis County landfill" constituted a "taking without the payment of just compensation in violation of" the Fifth and Fourteenth Amendments and under Article I, § 17 of the Texas Constitution. (Compl., Dkt. 1, at 3, 28–29).

The Takings Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, prohibits private property from being taken "for public use, without just compensation." *Murr*, 582 U.S. at 392 (citation omitted). U.S. Const. amend. V. Article I, § 17 of the Texas Constitution is "substantially similar." *See City of Austin v. Travis Cnty. Landfill Co.*, 73 S.W.3d 234, 238 (Tex. 2002) (noting that the federal takings clause is "substantially similar" to Article I, § 17 and explaining that "[t]his similarity has led [the Supreme Court of Texas], in other contexts, to rely on the United States Supreme Court's interpretation of the federal takings clause in construing our takings provision"). Governmental land-use regulations "may under extreme circumstances" constitute a regulatory taking. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–27 (1985) (explaining when a permit denial constitutes a taking). The County asserts that Plaintiffs have failed to state a claim under both the federal Constitution and Texas Constitution and thus moves to dismiss the claims under Rules 12(b)(6) and 12(b)(1), respectively.[12]

"To begin [its] assessment of the takings claim," the Court "ask[s] whether [Plaintiffs] have adequately pleaded that the City acted in a sovereign, rather than contractual, capacity in undertaking [the] complained-of actions." *See Mesquite Asset Recovery Grp.*, 154 F.4th at 317. This is because "a government must be acting in its sovereign capacity to effect a taking." *Preston Hollow Cap., L.L.C. v.*

---

[12] If Plaintiffs fail to state a viable takings claim under the Texas Constitution, the Court lacks jurisdiction over the claim. *See Hearts Bluff Game Ranch*, 381 S.W.3d at 476 ("In the absence of a properly pled takings claim, the state retains immunity.").

*Cottonwood Dev. Corp.*, 23 F.4th 550, 554 (5th Cir. 2022). The Fifth Circuit has acknowledged that "[t]aking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity." *Id.* at 553 (citation omitted). The Supreme Court of Texas has similarly held that a government acting "pursuant to colorable contract rights" is not liable for a taking under Article I, § 17 of the Texas Constitution, as it is "acting akin to a private citizen." *State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) (citation omitted).

Plaintiffs have alleged:

On August 8, 2023, Travis County sent a letter to Graham Development's counsel stating that the County's "staff" had reviewed the proposed use and determined that Plaintiffs' proposed use is "fundamentally incompatible with the County's ongoing responsibility for effectively managing the Landfill and protecting human health, safety, and the environment, as required by 30 Tex. Admin. Code § 330.463 (TCEQ, Post-Closure Care Requirements, Mar. 27, 2006).

(Compl., Dkt. 1, at 16). Plaintiffs assert that TCEQ has the sole authority to determine whether a new use is incompatible with post-closure care of a landfill, but that, by citing a section of the Texas Administrative Code in denying the new proposed use, the County "knowingly usurped authority reserved exclusively to the TCEQ." (Compl., Dkt. 1, at 29).

The County refutes that allegation, contending in its motion to dismiss that—"rather than [exercising] any regulatory authority"—it was "exercising a bargained-for contractual right under the Cooperation Agreement," such that it was acting in a contractual capacity. (Mot. to Dismiss, Dkt. 4, at 3, 10). It argues that Travis County's regulations could not have prevented Plaintiffs from changing the use of the Property, "because **TCEQ's** regulations govern Plaintiffs' ability to obtain a permit to change the use of the Landfill." (*Id.* at 10) (emphasis in original). The County further asserts that "Plaintiffs have not identified any facts explaining how Travis County's exercise of its contractual rights under the Cooperation Agreement prevented them from either applying for or receiving authorization from the TCEQ." (*Id.*). Plaintiffs respond, without citing case law in support,

15

that the "Takings Clause turns on the effect of the government action, not its label." (Resp., Dkt. 7, at 7). They also emphasize the County's "alleged reliance on environmental regulatory authority" and assert that "the County's *post hac* recasting of facts cannot serve as the basis for dismissal." (*Id.*).

The Court reiterates that two contractual provisions in the Cooperation Agreement are primarily at issue:

> 14. All Parties agree that TCEQ determines whether use of the Property, including the current use of the Property, is or is not materially detrimental to the TCEQ's landfill closure and post-closure care requirements and agree not to use the Property for any purpose that would be materially detrimental to TCEQ's landfill closure and post-closure care requirements.
>
> . . .
>
> 15. The Owner shall provide the County with written notice and the opportunity to review all future lease agreements, licenses, sales, or similar arrangements that allow for a continued use by Austin Country for the 21-acre flea market or any new use of the Property that affects the area above the closed Landfill that become effective subsequent to the Effective Date of this Agreement. Upon review, if the proposed use of the Property is incompatible or will compromise the maintenance of the Landfill's closure care, the County may deny the proposed lease, license, or other arrangement for use of the Property. Any dispute will be resolved by declaratory judgment action in a Travis County District Court.

(Cooperation Agreement, Dkt. 4-2, at 7–8).

It is true that the interaction between these two provisions could have been drafted with more precision by the contracting parties. Nonetheless, the Court must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Frew v. Janek*, 780 F.3d 320, 328 (5th Cir. 2015) (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)) (emphasis in original). The Cooperation Agreement explicitly requires the owner of the Property to provide the County with notice of any new uses and explicitly gives the County the power to deny the new use based on it being "incompatible" with Landfill closure or maintenance. (Cooperation Agreement, Dkt. 4-2, at 7–8). Plaintiffs fail to explain why the Court should not give effect to this provision, and they do not address **binding** case law

16

providing that a government acting in its sovereign capacity cannot "effect a taking." *See Preston Hollow*, 23 F.4th at 554. Nor do they provide the Court with case law stating that a governmental entity that would not normally have a right to review a new land use cannot contract "akin to a private citizen," *see Holland*, 221 S.W.3d at 643, for such a power. In fact, Plaintiffs themselves plead that the County's August 2023 "letter precluding Plaintiffs' proposed use for the salvage yard . . . asserted rights under Section 15 of the Cooperation Agreement." (Compl., Dkt. 1, at 22). Thus, even viewing the allegations in a light most favorable to Plaintiffs, Plaintiffs have not plausibly alleged that Travis County was acting in its sovereign capacity—as opposed to its contractual capacity—when it denied Plaintiffs' application to change the use of the Property.[13]

Moreover, even if the County's reference to 30 Texas Administrative Code § 330.463 did make it plausible that the County was acting in its sovereign power when it denied the proposed new use of the Property, Plaintiffs' takings claim would nonetheless fail based on the pleadings.[14]

First, it is not clear that Plaintiffs' takings claim is ripe. "A takings claim is not ripe until . . . the relevant governmental unit has reached a final decision as to what will be done with the property." *Sandy Creek Invs., Ltd. v. City of Jonestown*, 325 F.3d 623, 626 (5th Cir. 2003) (citations

---

[13] Plaintiffs have also not made clear why, if Travis County has no power to make land-use compatibility determinations, Plaintiffs applied to Travis County to change the use of the Property in the first place. It appears that they did so *because* of the Cooperation Agreement: "On April 18, 2023, and after numerous discussions with various Travis County representatives, Travis County received written notice of Graham Development's plan to lease, license or enter into an arrangement to relocate LKQ Auto Salvage yard . . . to the Property. On May 5, 2023, Graham Development provided additional information as requested by Travis County. **Combined, these letters fulfilled all duties under the Cooperation Agreement to provide written notice** of either the continued use of the flea market and/or new uses that affect the area above the Landfill." (Compl., Dkt. 1, at 15) (emphasis added). To the extent they did in fact submit this documentation pursuant to the terms of the Cooperation Agreement, Plaintiffs' actions only further demonstrate that the County was acting in its contractual capacity when it denied the new use.

[14] The Court does agree with Plaintiffs, however, that Meadows' acquisition of the Property after the denial by the County on August 1, 2023, does not necessarily bar their takings claim. *See Murr*, 582 U.S. at 398 ("A valid takings claim will not evaporate just because a purchaser took title after the law was enacted."); *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001) ("Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.").

17

omitted).[15] The same requirement applies under Texas law. *See Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 929 (Tex. 1998) ("Accordingly, in order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue."). The ripeness requirement "is only prudential, not jurisdictional." *Legacy Hous. Corp. v. City of Horseshoe Bay*, 158 F.4th 636, 645 (5th Cir. 2025) (citation omitted). Though Plaintiffs do allege that the County's decision in August 2023 was "conclusive and final," they simultaneously allege that *TCEQ*—not Travis County—is the "relevant governmental unit," *see id.*, that has the "exclusive regulatory authority over the closure and post-closure care of the landfill that is vested in it." (Compl., Dkt. 1, at 13). Even if the County approved of the change of use, Plaintiffs' allegations demonstrate that they would then need *additional* approval from TCEQ to change the use of the Property. The County argues that Plaintiffs have never applied to TCEQ for authorization to change the Property's use, (Mot. to Dismiss, Dkt. 4, at 3), and Plaintiffs do not refute or otherwise address this point. As such, the Court "cannot determine whether a regulation has gone 'too far,'" as the Court does not "know[] how far the regulation goes." *Id.* at 645 (quoting *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 348 (1986)).

Second, Plaintiffs have failed to plausibly allege that they had a constitutionally protected property interest in their application to move the auto salvage yard to the Property. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984) (stating that the first question when determining a takings claim is whether the plaintiff has a constitutionally protected property interest in the affected property); *Mesa Hills Specialty Hosp. v. Becerra*, 730 F. Supp. 3d 342, 351 (W.D. Tex. 2024) (citing *In re Trustees of Conneaut Lake Park, Inc.*, 855 F.3d 519, 526 (3d Cir. 2017)) ("A threshold determination in

---

[15] Though the Supreme Court has overruled its previous requirement that a property owner must first litigate a takings claim in state court, *see Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180, 185 (2019), "it did not alter the requirement for a final decision from the regulator before any litigation is commenced." *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215, 218 n.2 (5th Cir. 2021).

any takings case is whether the plaintiff has asserted a legally cognizable property interest.”); *Commons of Lake Hous., Ltd. v. City of Houston*, 711 S.W.3d 666, 686–87 (Tex. 2025) (citation omitted) (“To have standing for a Texas taking, [the plaintiff] need only establish that it has a vested ‘ownership interest *in the property taken*.’”) (emphasis added). Property interests are “not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.” *Ruckelshaus*, 467 U.S. at 1001 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)).

Travis County rightfully does not dispute that Meadows has a vested property interest in the Property itself. But Plaintiffs' regulatory takings claim asserts not that the Property *itself* was taken, but that the right to operate the property as an auto salvage yard was taken. (Compl., Dkt. 1, at 28). Plaintiffs cite no relevant case law to support that it has a property interest in an application for a land use change or in the land use change itself. Two cases Plaintiffs cite in their Response, for example, involved a protected interest in a permit the plaintiff had **already** been awarded. *See Bowlby v. City of Aberdeen*, 681 F.3d 215, 220 (5th Cir. 2012) (explaining that individuals have a property interest in a license or permit “once issued” and noting that the plaintiff had been issued a permit to operate her business); *KTK Min. of Va., LLC v. City of Selma*, 984 F. Supp. 2d 1209, 1226 (S.D. Ala. 2013) (“[The plaintiff] has presented undisputed evidence that it was duly issued the building permit.”). Plaintiffs, on the other hand, had never been awarded a permit to change the Property's use to an auto salvage yard. The mere “expectation of a permit does not give rise to a property interest” under Texas law or federal law. *See Lamar Advantage Outdoor Co., L.P. v. Tex. Dep't of Transp.*, No. 14-20-00362-CV, 2022 WL 1498213, at *5 (Tex. App.—Houston [14th Dist.] May 12, 2022, no pet.); *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 929–30 (5th Cir. 1988) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)); *Roth*, 408 U.S. at 576 (the Constitution protects the

19

"security of interests that a person has *already* acquired in specific benefits") (emphasis added).[16] Plaintiffs have therefore failed to sufficiently plead that they had a constitutionally protected property interest, such that they may make a regulatory takings claim.[17]

Third, even if their takings claim is prudentially ripe, and even if Plaintiffs did have a "constitutionally protected property interest to lawfully use and develop the property in accordance with state law,"[18] (Compl., Dkt. 1, at 28), Plaintiffs have failed to plead non-conclusory allegations to support a regulatory taking under the *Penn Central* factors. A partial regulatory taking "may be found based on 'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr*, 582 U.S. at 393 (quoting *Palazzolo,* 533 U.S. at 617). A takings claim under Texas law also looks to the *Penn Central* factors. *See Mayhew*, 964 S.W.2d at 935–36.

As to the second element, Plaintiffs have not sufficiently pleaded allegations to make it plausible that they reasonably expected this new use would be approved by the County. "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus*, 467 U.S. at 1005–06 (quoting *Webb's Fabulous Pharmacies*, 449 U.S. at 161). "The existing and permitted uses of the property constitute the 'primary expectation' of the

---

[16] *See also Riverside Bayview Homes, Inc.*, 474 U.S. at 127 ("A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired.").

[17] The Court also notes that Plaintiffs do not plead the County was required to accept their proposal. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) ("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."); *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 735 (5th Cir. 2008) (citing *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)) (explaining that courts look for "explicitly mandatory language" when determining whether statutes or regulations create a protected property interest).

[18] Plaintiffs do not cite any case law to support their allegation that they have a "constitutionally protected property interest to lawfully use and develop the property in accordance with state law." Even at the motion-to-dismiss stage, the Court need not accept a legal conclusion as true. *See Ashcroft*, 556 U.S. at 678.

landowner that is affected by regulation." *Mayhew*, 964 S.W.2d at 936 (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 129 (1978)). Courts are instructed to "look to the physical characteristics of the landowner's property," and "[i]n particular, it may be relevant that the property is located in an area that is subject to . . . environmental or other regulation." *Murr*, 582 U.S. at 398. Though a restriction predating a landowner's acquisition is not dispositive, it "can be one of the objective factors that most landowners would reasonably consider in forming their fair expectations about their property." *Id.*

Meadows purchased the Property in February 2024, when it was "on notice," *see Ruckelshaus*, 467 U.S. at 1006, that the County did not approve of the new proposed use. (Compl., Dkt. 1, at 29; Special Warranty Deed, Dkt. 4-1, at 2). This fact is not dispositive, *see Murr*, 582 U.S. at 398, but it and other facts nonetheless lead the Court to find it entirely implausible that Plaintiffs would reasonably believe the County would approve of their new proposed use. For instance, when Meadows purchased the Property, it knew—or should have known—that the Landfill on which the Property sat had a decades-long history of problems. Despite ceasing to accept new waste in 1982, the Landfill "has been leaking [leachate] for decades" and has "never fully closed." (Compl., Dkt. 1, at 6). Meadows also knew—or should have known—that the Property, is subject to special environmental regulations. *See id.* (noting that courts should give weight to whether a property is "located in an area that is subject to . . . environmental or other regulations" when considering a landowner's reasonable expectations). Based on the Landfill's "decades-long" history of "leaking [leachate] onto the property and [into] surrounding waterways," (Compl., Dkt. 1, at 6), on the Property plainly being subject to special environmental regulations, and on the County's denial of the new proposed use prior to Meadows's purchase of the Property, (*id.* at 15), Plaintiffs have failed to plausibly allege a reasonable investment-backed expectation.

Plaintiffs have also failed to sufficiently plead facts in support of the third *Penn Central* factor. "A taking may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. The facts alleged by Plaintiffs, even when viewed in the light most favorable to them, do not seem like a "physical invasion by government." *See id.* Plaintiffs can continue to operate the Property as a flea market. They also have the ability to propose other new uses for the Property; unlike the auto salvage yard proposal, other new uses may in fact be compatible with the Landfill's closure requirements. The Court ultimately finds that the plausible inference drawn from the allegations in the Complaint is that the County's denial of the new proposed use looked more like the County "adjusting the benefits and burdens of economic life to promote the common good" than a "physical invasion," *see id.*, which does not amount to a regulatory taking.

Because the regulatory takings test is "an 'essentially *ad hoc*, factual inquiry' evading 'set formula,'" *see Legacy Hous. Corp.*, 158 F.4th at 643, the Court in its discretion will not discuss whether Plaintiffs have met the first factor of the *Penn Central* test. As the allegations stand, they are not sufficient to raise a plausible takings claim under the Fifth Amendment or Article I, § 17 of the Texas Constitution. Accordingly, the Court will grant the motion to dismiss Plaintiffs' regulatory takings claims under the federal Constitution under Rule 12(b)(6) for failure to state a claim and under the Texas Constitution under Rule 12(b)(1) for lack of jurisdiction.[19]

---

[19] See *Hearts Bluff Game Ranch*, 381 S.W.3d at 491 ("In the absence of a properly pled takings claim, the state retains immunity."); *Warnock v. Pecos County*, 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice.").

**D. Physical-Invasion Takings Claim**

Plaintiffs assert that this case is "about an illegal taking and/or inverse condemnation of property . . . by Travis County . . . based on its decades-long illegal and inadequate maintenance of a closed landfill." (Compl., Dkt. 1, at 1). "A physical taking may occur 'where real estate is actually invaded by superinduced additions of water, earth, sand, or other material . . . so as to effectually destroy or impair its usefulness.'" *Redburn v. City of Victoria*, 898 F.3d 486, 496 (5th Cir. 2018) (quoting *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. (13 Wall.) 166, 181 (1871)). Flooding that is "recurrent . . . even if of finite duration" may be a viable basis for a takings claim. *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 27 (2012) ("We . . . conclude that recurrent floodings, even if of finite duration, are not categorically exempt from Takings Clause liability."). As with other types of takings claims, courts should determine whether the plaintiff has properly alleged an enforceable property right. *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014–19 (1992)). As with other types of takings claims, the plaintiff must additionally allege that the taking was done for a public use or purpose. U.S. Const. amend. V; Tex. Const. art. I, § 17.

Plaintiffs allege that "for decades, the closed Travis County Landfill has been leaking hazardous pollutants onto the property, and such leakage continues today." (Compl., Dkt. 1, at 2). According to Plaintiffs, the leachate leaking from the Landfill "contains toxins and heavy metals such as lead, barium and arsenic at nearly double the acceptable level established by the [Environmental Protection Agency]." (*Id.* at 17). They claim that "[b]y allowing leakage of leachate . . . and by failing to fix such leaks despite numerous notices of violation dating back decades, Travis County's failed stewardship has harmed the property." (Compl., Dkt. 1, at 3). They further assert that "the County's attempt to devalue the Property by failing and refusing to perform mandatory landfill [post-closure care] maintenance [] has effected a taking, damaging or destruction of the

23

Property without just and adequate compensation." (*Id.* at 28). Finally, Plaintiffs plead that the County had knowledge of the continued leakage based on "numerous notices of violation . . . from [TCEQ] and its predecessor agencies." (*Id.* at 2).

The County argues in its motion to dismiss that Plaintiffs' inverse condemnation claim is time barred under the ten-year statute of limitations, as Plaintiffs allege that the Landfill has been leaking leachate since 1973. (Mot. to Dismiss, Dkt. 4, at 7). Plaintiffs respond that the County's limitations theory "cannot bar claims premised on more recent acts . . . and ongoing invasions." (Resp., Dkt. 7, at 8–9).

The Court agrees with Plaintiffs that the ten-year statute of limitations does not bar Plaintiffs' inverse condemnation claims. According to Plaintiffs, the leachate leakage "continues today," and Travis County allegedly continues to fail to fix the problem to this day. (Compl., Dkt. 1, at 2). The Court therefore finds that Plaintiffs have properly alleged actions relating to their physical takings claim that occurred within the past ten years.

Next, Plaintiffs must have plausibly alleged that the County's taking was done for a public use or purpose. U.S. Const. amend. V; Tex. Const. art. I, § 17. The Court finds that Plaintiffs have failed to sufficiently make such an allegation in their Complaint. Though they make the conclusory allegation that the County engaged in an "uncompensated taking . . . for public use," (Compl., Dkt. 1, at 35), such a "[t]hreadbare recital[]" of an element of their takings claim does "not suffice."[20] *See Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). To the contrary, Plaintiffs allege that the County's failure "jeopardize[s] . . . public health," which tilts against the County's actions having a

---

[20] Plaintiffs could attempt to argue that they have satisfied this element by alleging that the County has intentionally failed to remediate the Landfill so it can retain control over the land and prevent a use of the Property disfavored by the County. (Compl., Dkt. 1, at 21–22). For one, Plaintiffs did not plead that this alleged motivation qualifies as a public purpose. And, even if they had, the Court finds that this speculative allegation does not "nudge[] their claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

public purpose. (Compl., Dkt. 1, at 19). *See Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004) ("[W]e seek to ensure that the public does not bear the burden of paying for property damage for which it received no benefit."). The Court will therefore grant the motion to dismiss Plaintiffs' federal inverse condemnation claim based on a physical-invasion taking under Rule 12(b)(6) for failure to state a claim and dismiss their parallel state constitutional claim under Rule 12(b)(1) for lack of jurisdiction.[21]

### E. Substantive and Procedural Due Process Claims under 42 U.S.C. § 1983

### 1. Procedural Due Process

Plaintiffs allege that, "[b]y making a land use compatibility determination that it was not authorized to make, the County precluded Plaintiffs from having a meaningful opportunity to be heard, and/or it made a determination resulting in a deprivation of Plaintiffs' established property rights without a meaningful opportunity to be heard." (Compl., Dkt. 1, at 29–30). They further claim that the "County's arbitrary and irrational abuse of power deprived Plaintiffs of their constitutionally protected private property rights without due process of law and in violation of the Fourteenth Amendment to the United States Constitution." (*Id.* at 30).

As with Plaintiffs' takings claims, the Court must first ask whether Plaintiffs have plausibly alleged being deprived of a constitutionally protected property interest. The Court already determined in Section III(C), *supra*, that they have failed to sufficiently plead a "legitimate claim of entitlement" to developing an auto salvage yard on the Property, and the Court reiterates that holding here.

---

[21] *See Hearts Bluff Game Ranch*, 381 S.W.3d at 491 ("In the absence of a properly pled takings claim, the state retains immunity."); *Warnock*, 88 F.3d at 343 ("Because sovereign immunity deprives the court of jurisdiction, the claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice.").

Moreover, though Plaintiffs make the conclusory allegation that they did not have a "meaningful opportunity" to be heard, (Compl., Dkt. 1, at 29–30), the facts pleaded in the Complaint refute that claim:

> 75. On April 18, 2023, **and after numerous discussions with various Travis County representatives**, Travis County received written notice of Graham Development's plan to lease, license or enter into an arrangement to relocate LKQ Auto Salvage yard from its current location on South Congress Street to the Property. Relocation would have thus allowed Graham Development to redevelop the site located at 7900 S. Congress Steet site prior to the expiration of the LKQ Corp. lease in July of 2036

> 76. On May 5, 2023, **Graham Development provided additional information as requested by Travis County**. Combined, these letters fulfilled all duties under the Cooperation Agreement to provide written notice of either the continued used of the flea market and/or new uses that affect the area above the Landfill.

(*Id.* at 15) (emphasis added). They do not provide any facts to the contrary supporting that they did not have a meaningful opportunity to be heard. Based on the above, the Court will grant the County's motion to dismiss Plaintiffs' procedural due process claim for failure to state a claim.

### 2. Substantive Due Process

Plaintiffs allege that their "substantive due process rights were violated because the County was acting under color of state law when it arbitrarily and without any rational basis exercised authority exclusively reserved to the TCEQ through the State of Texas and made a land use compatibility determination that Plaintiffs proposed property use was incompatible with the County's landfill post-closure care responsibilities." (Compl., Dkt. 1, at 30). To sufficiently plead a substantive due process claim, a plaintiff must "(1) allege a deprivation of a constitutionally protected right; and (2) demonstrate that the government action is not rationally related to a legitimate governmental interest." *Cripps v. La. Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016) (quotation and citation omitted).

Once again, Plaintiffs must have plausibly alleged deprivation of a constitutionally protected right. As already discussed, they have failed to do so. *See* Section III(C), *supra*. And, even if Plaintiffs

had satisfied this element, they have also failed to sufficiently plead allegations for the second element of their substantive due process claim. "The question is only whether a rational relationship exists between the [decision] and a conceivable legitimate objective. If the question is at least debatable, there is no substantive due process violation." *Simi Inv. Co. v. Harris County,* 236 F.3d 240, 251 (5th Cir. 2000) (quoting *FM Prop. Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996)). The Fifth Circuit has described this as a "low threshold" for the government. *Id.* Here, Plaintiffs have "failed to show that the [application denial] does not relate to the government's interest in . . . ensuring the health and safety of the public." *See Cripps*, 819 F.3d at 233. They allege that changing the use of the Property from a flea market that "sells manufactured and used auto parts" is "the same use to which Plaintiffs would put the property, just on a larger scale." (Compl., Dkt. 1, at 17). But they do not grapple with the fact that this admitted-to "larger scale" itself provides the County with a rationale basis on which to deny their application. The County has a "conceivable legitimate objective" of attempting to stop, or at least decrease, the leachate leakage from the Landfill. It is rational that a "larger scale" use of the Property would be detrimental to that objective.[22] The Court will therefore grant the County's motion to dismiss Plaintiffs' substantive due process claim for failure to state a claim.

### F. Miscellaneous Claims

Plaintiffs also plead causes of action for "declaratory judgment" and for a "writ of mandamus." (Compl., Dkt. 1, at 31, 33). Plaintiffs clarified in their Response that they are "seek[ing] prospective equitable relief under § 1983 to halt ongoing constitutional violations, and in the alternative, declaratory/injunctive relief within supplemental jurisdiction." (Response, Dkt. 7, at 13). Given that these are remedies rather than causes of action, and given that the Court is dismissing

---

[22] The County provided this effective imagery: "Placing stacks of disposed vehicles on top of the Landfill would be similar to placing a brick on top of an already-wet sponge, thereby increasing the amount of potentially contaminated leachate to be collected." (Reply, Dkt. 8, at 10).

Plaintiffs' substantive causes of action (breach of contract, taking, procedural due process, and substantive due process), the Court will also grant the County's motion to dismiss these "causes of action."

### G. Leave to Amend

Courts in the Fifth Circuit are meant to liberally grant leave to amend, unless amendment would be futile. *See Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 322 (5th Cir. 2009). Plaintiffs request leave to amend should the Court "identif[y] any pleading defect." (Resp., Dkt. 7, at 14). The County argues in its Reply that the Court should find that amendment would be futile and deny their request.

Based on the severe pleading deficiencies related to Plaintiffs' breach-of-contract claim, federal and state regulatory takings claims, procedural due process claim, and substantive due process claim, the Court agrees that amendment of their pleadings for these claims would be futile and cause needless delay. The Court finds, however, that it is possible Plaintiffs could plausibly plead a physical-invasion takings claim. Should they wish to do so, Plaintiffs may file a motion for leave to file an amended pleading—solely for their physical-invasion takings claim—on or before **March 31, 2026**. If Plaintiffs choose to file a motion for leave to file an amended pleading, they shall attach to the motion a proposed amended pleading.

28

## IV. CONCLUSION

For these reasons, **IT IS ORDERED** that Travis County's Motion to Dismiss, (Dkt. 4), is

**GRANTED**, such that:

- Plaintiffs' federal claims under the Fifth and Fourteenth Amendments for a regulatory taking, violation of procedural due process, and violation of substantive due process are **DISMISSED WITH PREJUDICE** under Federal Rule of Civil Procedure 12(b)(6);

- Plaintiffs' federal physical-invasion takings claim under the Fifth and Fourteenth Amendments is **DISMISSED WITHOUT PREJUDICE** under Federal Rule of Civil Procedure 12(b)(6);

- Plaintiffs' state-law claims for breach-of-contract, regulatory taking, and physical-invasion taking are **DISMISSED WITHOUT PREJUDICE** under Federal Rule of Civil Procedure 12(b)(1); and

- Plaintiffs' claims for a declaratory judgment and writ of mandamus are **DISMISSED WITH PREJUDICE**, as these are not independent causes of action.

**IT IS FURTHER ORDERED** that Plaintiffs may file a motion for leave to file an

amended pleading—solely for their physical-invasion takings claim—on or before **March 31, 2026**,

and that such motion must have attached a proposed amended pleading.

**SIGNED** on March 17, 2026.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

29